Argued May 22, reversed June 18, 1973

CASPER, *Appellant, v.* STATE ACCIDENT
INSURANCE FUND (No. L-10,292),
*Respondent.*
511 P2d 451

*Raymond J. Conboy,* Portland, argued the cause for appellant. With him on the brief were Pozzi, Wilson & Atchison and Donald N. Atchison, Portland.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

LANGTRY, J.

This is a workmen's compensation appeal. The question is whether claimant was within the course and scope of his employment at the time he was injured in a motorcycle-automobile collision during his noon hour from work on May 14, 1971. The hearing officer, Workmen's Compensation Board and circuit court successively resolved this question against the claimant.

Claimant was a regular farm employe of Mr. Walchli who was engaged in intensive diversified cropping of 450 to 500 acres of land in several fields spread over approximately a 25-mile area around the towns of Hermiston and Stanfield in Umatilla County. Claimant owned a motorcycle which was kept continuously for about 10 days preceding the injury, and frequently on other occasions, at the headquarters shed where employes usually gathered before dispersing to work on Mr. Walchli's various properties. Claimant usually rode back and forth to work from his home which was in Hermiston with another employe, Keith, in Keith's personally owned vehicle. Keith and claimant often used their own respective vehicles in traveling from workplace to workplace

after they reported for work, and some of the time Walchli supplied them with fuel therefor from his pump at the shed. There was also evidence that he disapproved of this supplying of fuel to them, and had "bawled" them out for taking his fuel. In any event, the evidence is clear that he knew about and acquiesced in, at the least, their use of their personal vehicles in this manner.

On the morning of May 14 claimant and Keith came to work several minutes late in Keith's vehicle. They parked at the shed and then went with Walchli and Walchli's brother-in-law Jerry in employer-owned vehicles to another field several miles away near Stanfield where they all worked during the morning. Noon hour normally was from 12 to 1 and it was unpaid time. At noon claimant and Keith returned to the shed in one of Walchli's vehicles and Walchli and Jerry returned in another. At approximately 12:20 p.m. claimant and Keith were in Keith's vehicle leaving to go to Hermiston for lunch when Walchli drove his vehicle up to Keith's. Walchli suggested or told claimant to ride his motorcycle home for lunch and afterward to go on it back to the field near Stanfield, where they had been, to do rotovating, inasmuch as the other work which the four together had been doing was completed and the others would not return to that place. There is confusion and contradiction in the record about what, exactly, Walchli told claimant with reference to the taking of the motorcycle and the time he could take for the noon hour. We detail the highlights of the testimony about the conversation in the footnote.[1] The record is clear that, as a consequence

---

[1] Claimant testified:

"A. Keith was going to give me a ride home and then

of this conversation with Mr. Walchli, claimant got out of Keith's vehicle and started to ride home on his motorcycle. The accident occurred while claimant was on his way home.

he was going to bring me back out at one. But Skip [Walchli, the employer] told me to take my bike home and go directly to Stanfield to start rotovating at one o'clock. And to rotovate the whole day and change pipe out there that night and then go home.

"* * * * *

"A.  * * * We didn't know what we were going to do at that time, when Skip came over and told me to take my bike in and go out the Stanfield Highway to Stanfield and be back to work at one o'clock and to start rotovating at Stanfield. Rather than to go back to the shed with Keith and make it a longer distance to go back out. It would have taken a longer time also.

"* * * * *

"Q.  About what time did you leave the shed that day?
"A.  Approximately 20 after 12.
"Q.  You then had how long before you were to report to Stanfield?
"A.  I was to be there at one o'clock."

On cross-examination claimant testified:

"Q.  Did Mr. Walchli tell you to take your bike, or did he suggest you take your bike?
"A.  He told me to take my bike.
"Q.  He didn't suggest it?
"A.  No, because I was going home with Keith.
"Q.  Was there any discussion about the fact that if you went home with Keith, you might be a longer period of time when you got back?
"A.  Yes. That's what he was concerned about, because it would take longer for Keith to take me back up and go out to the shed than for me to get my bike and go out to Stanfield. That's what it was all about."

Much of Mr. Walchli's testimony, like "Stengelese," was difficult to follow, and ambiguous:

"Q.  Then what happened when Keith and Bernie [claimant] got into Keith's Scout?
"A.  [Mr. Walchli:]  Well, I put it to them, or suggested, either way you want to put it. I told Bernie to, ask him, to take his own rig for the purpose we weren't going back over

Mr. Walchli kept no time records for his employes but depended upon them to keep their time and he paid according to what they told him about hours of labor.

to Stanfield, as Keith wouldn't be. If he wanted to from there —however they wanted to do it. But my idea was that from home to Stanfield wasn't that much further and it would be better when he got off work and it would be even quicker for him to get home likewise. Now there was no other rig, particular rig, that he had to use his rig. If he didn't want to he'd just have to say no and when he come back he'd got a rig, of my own there. But this, this was just—working with him, Bernie was good working with. And I just, it was just convenient, hoever [sic] said what, and that was fine. We got along good.

"* * * * *

"A. Keith was there. Jerry was there.

"Q. Anybody else?
"A. No."

On redirect examination after all other witnesses (including those quoted infra) had testified, Mr. Walchli was closely questioned about what time he told claimant to be at work at Stanfield. His testimony in that regard was ambiguous and best summed up with the following questions and answers in cross-examination:

"Q. Well, my question is, are you telling us that you did not tell him to be there at one o'clock?

"A. I would say no, I didn't tell him that, just after dinner to go back over to Stanfield.

"Q. So you think these other witnesses['] recollection is incorrect about whether you said one o'clock or not?

"A. Exactly one, yeah, I would say, I can't be sure."

Keith testified:

"A. Skip told Bernie to take his bike home and leave from his house after he ate lunch for Stanfield, because it would be faster for him. And like if we went in my Scout, I would have to drive him to his house and drop him off and then go to mine and then after we'd eat, I would have to drive over to his and pick him up and then we would have to drive back out to the shed. And Skip told him to take his bike, that it would be faster if he would take his bike.

"* * * * *

"Q. Do you remember what time Mr. Walchli told Bernie he was supposed to be in the field?

"A. One.

He said he did not pay for less than "half hour." His testimony was ambiguous.[2]

Although each of the three preceding tribunals which have considered the facts on the basis of the testimony before the hearing officer have concluded that claimant was not in the course and scope of his employment, we think a preponderance of the evidence indicates that Mr. Walchli had cut claimant's noon hour short and that it was for the benefit of the employer that the claimant went home for lunch on his motorcycle. If claimant had not taken his motorcycle he would have had to return to the shed after lunch

---

"Q. Did he tell him he had to be there at one, or he wanted him to be there at one?
"A. He told him to be there at one."

Jerry testified:

"Q. Who all was present at the time of that conversation?
"A. There was just Grabael [Keith] and Skip and Bernie, and myself.

"Q. To the best of your recollection what was the conversation?
"A. All I know is that Skip told him to go back over to the field and start rotovating after lunch.

"Q. Do you recollect whether or not Skip either told him or suggested to him that he was to—should ride his Honda home for lunch?
"A. I don't remember that part of it, but I do know that he took his Honda."

[2]
"A. [Mr. Walchli:] Well, there's times, they keep their own time and what time they got to work, they usually went to work. But if they came a few minutes late, if it was 15 minutes['] factor. Usually it was before 15 minutes, I imagine they took it from the time they were supposed to be to work, anyway go to the half hour, because I never did pay by the 15 minutes.

"Q. So you paid by the half hour at the minimum?
"A. At the minimum only. They hardly ever kept it otherways."

and then travel on his employer's time to the field where he was to work. Likewise, he would have to stop work in the field prior to the normal quitting time in order to be at the shed at quitting time to ride home with Keith. If he had gone in Keith's vehicle, as he otherwise would, in all probability claimant would not have been in an accident or injured.

We now proceed to consider whether our de novo review of the facts dictates a different conclusion than that of the circuit court.

■ Generally an accidental injury to an employe is not covered by workmen's compensation as being one "* * * arising out of and in the course of employment * * *" (ORS 656.002 (6)) if it occurs off the employer's premises while the employe is going to or coming from lunch on unpaid time. 1 Larson, Workmen's Compensation Law 4-62, § 15.51 (1972). However, there are the usual exceptions, and claimant contends his injury falls therein.

The quotation from Corpus Juris in *Munson v. State Ind. Acc. Comm.*, 142 Or 252, 256, 20 P2d 229 (1933), is still apropos of cases such as this:

> " ' "In determining whether an accident arose out of and in the course of the employment, each case must be decided with reference to its own attendant circumstances, and it has indeed been stated rather broadly, but by eminent authority that argument by analogy is valueless." Corpus Juris, (W. C.) p. 73'. 1 Schneider, Workmen's Compensation Law (2d Ed.), p. 741, § 262."

In *Munson* it is made clear that the fact the employe is injured during unpaid time does not, in itself, defeat coverage. Important to the decision was that "[a]t the time of the injury, he was engaged in forwarding

and facilitating his master's business, and * * * 'Any other ruling would discourage helpful loyalty'." (142 Or at 260.)

In *Jordan v. Western Electric*, 1 Or App 441, 443-44, 463 P2d 598 (1970), we set out factors to be considered in deciding such questions as follows:

"'a) Whether the activity was for the benefit of the employer * * *;

"'b) Whether the activity was contemplated by the employer and employee either at the time of hiring or later * * *;

"'c) Whether the activity was an ordinary risk of, and incidental to, the employment * * *;

"'d) Whether the employee was paid for the activity * * *;

"'e) Whether the activity was on the employer's premises * * *;

"'f) Whether the activity was directed by or acquiesced in by the employer * * *;

"'g) Whether the employee was on a personal mission of his own * * *.'"

■ We think in the case at bar the evidence clearly favors claimant under a), b), f) and g). Because the employe's noon hour was shortened, and the employer's interests were furthered, we think the injury occurred while claimant was on a personal mission also advantageous to his employer. *See* 1 Larson, supra, 4-149, § 18.00.

Another major consideration which inclines us to decide in favor of coverage is the rule broadly stated in 1 Larson, supra, 4-144, § 17.50:

"If the employee as part of his job is required to bring with him his own car, truck or motorcycle for use during his working day, the trip to and from

work is *by that fact alone* embraced within the course of employment * * *." (Footnote omitted.) (Emphasis supplied.)

We recognize that it is arguable from the evidence whether claimant was generally "required" to bring his own vehicle by his employer. Certainly, at the least, he received strong encouragement from the employer to bring it, and its presence was acquiesced in and definitely a benefit to the employer. We believe that, more importantly, its use was required by the employer on the occasion of the injury. The employe could hardly be expected to refuse to use his motorcycle under the circumstances of the request or direction, as the fact may be, which was disclosed by the evidence.

A principal case relied upon by Larson in support of the broad rule quoted is *Smith v. Workmen's Comp. App. Bd.,* 69 Cal 2d 814, 73 Cal Rptr 253, 447 P2d 365 (1968). In that case the California Supreme Court categorically overruled a long-standing California decision to the contrary, and held that an employe, a social worker, whose vehicle was brought to his work and often used in furtherance of the work, even though there was evidence that employer-owned vehicles were available, was covered when injured in an accident on the way to work. The evidence reported in that case, in our opinion, was as confusing, and perhaps not as strong, as the evidence favoring claimant in the case at bar. On the basis of such evidence the California Supreme Court in what we think is a well-reasoned opinion upset the appeal board's and referee's rejections of coverage. The compelling reason for the ruling was that rejection of the claim

"* * * does not recognize an important limita-

tion upon the going and coming rule. That limitation arises from the principle that an employee 'is performing service growing out of and incidental to his employment' (Lab. Code, § 3600) when he engages in conduct reasonably directed toward the fulfillment of his employer's requirements, performed for the benefit and advantage of the employer * * *.

"* * * * *

"* * * An employer cannot request or accept the benefit of an employee's services and concomitantly contend that he is not 'performing service growing out of and incidental to his employment.' " 69 Cal 2d at 819-20.

We do not consider the statutory language defining a covered injury in Oregon to be, in any material sense involved here, different from that of California. In *Jordan v. Western Electric,* supra, which involved a coverage question, we placed similar reliance upon a recent California Supreme Court opinion.[9]

Considering the factors and opinions we have discussed, we conclude the claimant suffered his injury "* * * arising out of and in the course of employment * * *."

Reversed.

---

[9] The language of the Cal Labor Code § 3600 (West 1971), cited in the text of the quote is that a workman is covered if the injury occurs while he "* * * is performing service growing out of and incidental to his employment * * *." ORS 656.002 (6) states that there shall be coverage for injury "* * * arising out of and in the course of employment * * *."