Argued and submitted October 1, 1979,
reversed and remanded January 2, 1980

In the Matter of the Compensation
of the Beneficiaries of
GEORGE CLARK, Deceased,
*Petitioner,*

*v.*

U. S. PLYWOOD,
*Respondent.*

(No. 76-6736, CA 10832, SC 26109)

605 P2d 265

Benton Flaxel, North Bend, argued the cause for petitioner. With him on the brief was Flaxel, Todd & Nylander, North Bend.

Keith D. Skelton, Portland, argued the cause and filed a brief for respondent.

PETERSON, J.

Holman, J., concurring opinion.

## PETERSON, J.

This case involves a widow's claim for workers' compensation benefits. Her husband, George Clark, was killed while retrieving his lunch, which he had left to be warmed atop a hot glue press. The referee denied compensation. The Workers' Compensation Board reversed and ordered acceptance of the claim. The Court of Appeals reversed and denied recovery,[1] and we granted review to consider the extent to which personal comfort activities of a worker will be deemed to arise out of and within the course of employment. ORS 656.005(8)(a).

### THE FACTS

Clark was employed at a Gold Beach plywood manufacturing plant. He worked a shift which began at 11 p.m. and ended at 7 a.m. During this shift Clark was paid for two 10-minute breaks and a 20-minute lunch period. The lunchrooms provided by the employer contained a table and vending machines, but no facilities for heating food brought by the employees.

On the night of Clark's death, he had brought a lunch which needed to be warmed. About two hours before his lunch break, he approached the assistant operator of a hot glue press and asked him to place Clark's food container on the top of the press to be warmed. The assistant press operator had done this before for Clark and testified that two or three times a week he placed food on the press for other employees. The hot glue press was about 100 feet from Clark's work station. Judge Joseph described the hot glue press in the Court of Appeals opinion.[2]

> "The machine consists of two large units, the press and the carriage, each about 20 feet high and 15 feet square. When the units are separated, there is a gap approximately three feet wide between them. Chains on each end of the gap prevent one from entering the

---

[1] 38 Or App 381, 590 P2d 281 (1979).

[2] 38 Or App 383 at n 1.

[257]

gap while the machine is in operation. The chains are connected to a fail-safe device; when either of the chains is unhooked, the machine is inoperable. The press is capable of bonding about 25 sheets of plywood at a time, the sheets lying parallel to the floor. The carriage is mounted on tracks which connect it to the press. The major component of the carriage is the charger. It mechanically feeds the press with the wood to be bonded into sheets and is loaded by the operator and his assistant. It is activated by a switch on the operator's control panel. When activated, the carriage moves along the tracks to the press, closing the gap. The charger nests with the shelves of the press. The wood is pushed from the charger into the press by a device which sweeps from the back of the charger to the end nested with the press. Part of that feeding device is a beam which sweeps across the top of the charger. It was that beam which crushed the worker."

Normally the press operator would himself remove a safety chain blocking the three-foot alley between the press and charger, climb the face of the charger, and place the food on a hot ledge on the top of the press. The chain was connected to an electrical switch, and its removal prevented the charger from moving toward the hot press. A sign stating "DANGER, KEEP AWAY" hung from the chain. On this occasion, however, the assistant press operator was eating, and suggested that Clark could climb up the charger as easily as he could. The operator testified that he told Clark to drop the chain and the charger would not move. Clark did so, climbed the face of the charger, and placed his food on the ledge.

When Clark returned to retrieve his lunch, the charger had just been loaded and the press operator and his assistant were getting ready to move the load into the press. The assistant press operator noticed that Clark was standing at the foot of a ladder which led to the top of the charger and heard him mention something about retrieving his lunch. The assistant press operator testified that he "didn't pay that much

attention" to Clark because he had to go around to the back of the press to straighten panels. Nor could the press operator see Clark, because his control panel was on the opposite side of the charger. Clark possibly climbed the ladder, intending to ride the carriage over to the hot press whereupon he would reach over and retrieve his lunch. The press operator activated the charger and Clark was killed when the charger moved across the top of the carriage, crushing Clark between the charger and a stationary cross beam on the front of the carriage.

## APPLICABLE WORKERS' COMPENSATION STATUTES

A "compensable injury," under ORS 656.005(8)(a), is "an accidental injury * * * arising out of and in the course of employment * * * resulting in disability or death * * * whether or not due to accidental means." Contributory fault or contributory negligence is no defense to a claim for compensation benefits, unless due to "the deliberate intention of the worker." ORS 656.156(1). All that a claimant must prove is that the injury arose "out of and in the course of employment." The worker has the burden of proving that the injury arose out of and in the course of employment. *Ballou v. Industrial Accident Com.,* 214 Or 123, 328 P2d 137 (1958); *Butts v. State Ind. Acc. Comm.,* 193 Or 417, 239 P2d 238 (1951).[3]

The compensation act provides broad coverage, the boundaries of which are determined by the meaning of "arising out of and in the course of employment." As with most difficult questions, the delineation of the limits of the coverage is anything but knife-edge clear. But as in all difficult cases (this being one such case), the delineation must be made.

The Court of Appeals correctly characterized the issue as being "* * * whether the employee's death

---

[3] Overruled in part on other grounds, *Woody v. Waibel,* 276 Or 189, 192 n 3, 554 P2d 492 (1976).

arose out of and in the course of his employment, as required by ORS 656.005(8)(a)."[4]

## MEANING OF "ARISING OUT OF AND WITHIN THE COURSE OF EMPLOYMENT"

The words "in the course of employment" have been repeatedly defined as relating "to the time, place, and circumstances under which the accident takes place."[5] The words "arising out of" normally refer to the requirement of a "causal connection between the employment and the accident." [6]

The following example will illustrate the difference: A machinist working at a lathe has an attack of appendicitis. The attack occurred in the course of his employment since it occurred while he was on the job performing his normal activities. On the other hand, it did not arise out of his employment. There was no causal connection between the work and the attack.[7]

## COMPENSABILITY OF ON-PREMISES INJURY CLAIMS

Most claims for on-premises injuries[8] fall within one of two general categories:

Category 1. Injuries sustained while performing one's appointed task;

Category 2. Injuries sustained while engaged in other incidental activities not directly involved with

---

[4] 38 Or App at 383.

[5] *Stuhr v. State Ind. Acc. Com'n,* 186 Or 629, 634, 208 P2d 450 (1949) (*quoting Brady v. Oregon Lumber Co.,* 117 Or 188, 243 P 96 (1926)); *Larsen v. State Ind. Acc. Com.,* 135 Or 137, 139, 295 P 195 (1931); *Lamm v. Silver Falls Tbr. Co.,* 133 Or 468, 482-483, 277 P 91, 286 P 527, 291 P 375 (1930).

[6] *See* cases cited in the previous footnote. Also *see Ramseth v. Maycock,* 209 Or 66, 71, 304 P2d 415 (1956).

Further, see discussion in *Stark v. State Industrial Acc. Com.,* 103 Or 80, 88, 204 P 151 (1922).

[7] This example is drawn from Oregon State Bar, Workmen's Compensation § 11.3 (1975).

[8] By "on-premises" injuries we mean injuries sustained by a worker on the employer's premises.

the performance of the appointed task, such as preparing for work, going to or from the area of work, eating, rest periods, going to the bathroom, or getting fresh air or a drink of water.

Injuries sustained by a worker in doing the appointed task are normally compensable, absent self-inflicted injury. Contributory fault of the employee is no defense. Even when a worker is performing an appointed task in a prohibited manner, injuries are normally compensable. If a worker operates a machine with the guard removed, or fails to stop a machine before reaching into it, or oils machinery while it is running, injuries so sustained are normally compensable even though the specific act causing the injury was prohibited. 1A A. Larson, The Law of Workmen's Compensation § 31.21 (1979).

Many premises-related injuries are also normally compensable even though the worker is not engaged in the appointed task. A worker who trips over a step while walking to the bathroom on the employer's premises, or who falls on the way to the company locker room to change clothes, or who trips while going to get a breath of fresh air to escape the heat of working quarters—all normally are entitled to compensation. See 1A A. Larson, *supra,* § 21.10 to 21.84.

Most courts allow recovery for injuries sustained while engaged in recreational activities during lunch hours or rest periods, if the activity is a normal or accepted one. As to such claims, Professor Larson states:

> "* * * When seeking for a link by which to connect an activity with the employment, one has gone a long way as soon as one has placed the activity physically in contact with the employment environment, and even further when one has associated the time of the activity somehow with the employment. This done, the exact nature and purpose of the activity itself does not have to bear the whole load of establishing

work connection, and consequently the employment-connection of that nature and purpose does not have to be as conspicuous as it otherwise might. * * *.

"* * * It is generally held sufficient that the activity is an accepted and normal one, since it thereby becomes a regular incident and condition of the employment * * *."

Lunchtime injuries are normally compensable, if they occur on the premises and arise from premises hazards such as building collapse, tripping on a hole in the floor, or falling on slippery steps. 1A A. Larson, *supra,* § 21.20.

In *Lamm v. Silver Falls Tbr. Co.,* 133 Or 468, 277 P 91, 286 P 527, 291 P 375 (1930), we held that a lumber camp worker returning from a holiday in Silverton was covered by the Workmen's Compensation law when he sustained injury while riding on the company-owned train back to the logging camp. We quoted from *Cudahy Co. v. Parramore,* 263 US 418, 423-424, 44 S Ct 153, 68 L Ed 366, 30 ALR 532 (1923) as follows:

"'Workmen's compensation legislation rests upon the idea of status, not upon that of implied contract; that is, upon the conception that the injured workman is entitled to compensation for an injury sustained in the service of an industry to whose operations he contributes his work as the owner contributes his capital—the one for the sake of the wages and the other for the sake of the profits. The liability is based, not upon any act or omission of the employer, but upon the existence of the relationship which the employee bears to the employment because of and in the course of which he has been injured. * * * No exact formula can be laid down which will automatically solve every case.'" 133 Or at 495-496.

Respecting the quotation from *Cudahy,* we stated (133 Or at 496-498):

"The above being the test by which the right to compensation is determined, the propriety of the awards in the noon-hour lunch, sleeping upon the premises, shower bath, etc., cases becomes apparent. We shall refer to the facts of one of these cases by way

[262]

of summary. In *Zurich General Accident & Liability Ins. Co. v. Brunson,* 15 Fed. (2d) 906, employees who had been working in the woods built a fire during the noon hour on the steep slope to dry their clothes and warm themselves while they ate their lunches. Somehow the plaintiff, who was one of them, fell down the slope, into the fire and sustained injuries. The holding of the Circuit Court of Appeals for the Ninth Circuit that this injury arose out of and in the course of the employment is easily explainable under the above interpretation of those who are entitled to the compensation provided by the act.

"In all of the foregoing instances the injury, like that in our case, was sustained while the employee was doing something which was ancillary to his employment. We quote once more from *Larke v. John Hancock Mutual Life Ins. Co.,* supra [90 Conn 303, 97 A 320 (1916)]:

" 'The duty ancillary or incident to the employment has in some instances been held to include the doing of something primarily for the benefit of the employee, but ultimately it is assumed for the master, as the preparation of a noon-hour lunch, or the doing of something by the employee which he reasonably believes for the master's interest.'

"One might be tempted to conclude that in the various cases reviewed the court felt that eating the lunch, sleeping upon the premises, or taking the shower bath were acts indirectly for the benefit of the employer, and that therefore an injury sustained in the course of such acts should be compensated out of the fund. Possibly a better theory of these decisions is that in all of these cases the nature of the work was such that the workmen's usefulness was increased if he ate his lunch near his workbench, or slept upon the premises at night so that he might start his fires early in the morning; thus since he was exposed to the hazards of the industry while eating or sleeping an award of compensation was held justifiable. Such being the trend of authority it would seem singular to deny compensation to another who in returning to work, and thus doing an act beneficial to his employer, is injured by one of the hazards of the industry.

[263]

"The above will suffice to establish the fact that in order to be entitled to compensation it is not necessary that at the time of the accident (1) the employee was doing something for the direct benefit of the master, (2) that he was at his place of duty, and (3) that he was injured during working hours. * * *."

## COMPENSABILITY OF "PERSONAL COMFORT" INJURIES IS DETERMINED BY WHETHER THE ACTIVITY WAS EXPRESSLY OR IMPLIEDLY AUTHORIZED

In the case at bar, claimant asserts:

"(a) The activity of obtaining his lunch was for the benefit of the employer and in furtherance of its interest in having a refreshed employee * * *.

"(b) The activity of employees heating lunches on the press was contemplated by the employer and employee at the time of hiring, because it was common for employees to bring lunches needing to be heated and to heat them wherever they could since no facilities were provided.

"(c) Since the press was often used to heat lunches (on the average of once or twice a week for over a year before this accident and more frequently before then), placing and retrieving them from the press was an ordinary risk incidential [sic] to decedent's employment.

"(d) Decedent was on a paid lunch period at the time of the accident.

"(e) The activity was on the employer's premises.

"(f) The activity was acquiesced in by the employer in that it was a common, open and visible practice for employees to heat lunches on the press and not objected to or prohibited at the time of the accident.

"(g) Decedent was not on a personal mission of his own as this term is generally used in this context, but rather was picking up his lunch so he could refresh himself and return to his duty station within the brief (20 minute) period allowed to eat."

We have never had occasion to definitively discuss the bases for the compensability of injuries received during personal comfort activities. As Judge Joseph

observed, the Court of Appeals has several times held that "injuries incurred in 'personal comfort' activities incidental to employment may be compensable."[9] But the Court of Appeals denied recovery, stating:

> "The conduct from which Clark's fatal injuries resulted was so unreasonable that it cannot fairly be considered incidental to his employment * * *." 38 Or App at 388.

The Court of Appeals' holding that compensability is determined by the reasonableness of the worker's conduct has no foundation in the workers' compensation statutes or in Oregon case law. The rule is generally to the contrary: If an act is within the course and scope of employment, and arises therefrom, reasonableness of the employee conduct is irrelevant.

However, as Professor Larson points out, some jurisdictions have held that personal comfort injuries are not compensable if the method chosen is unusual, unreasonable, or abnormal. 1A A. Larson, *supra,* § 21.80. But Larson admits that the test of reasonableness is at best a "rubbery yardstick," and he argues for the substitution of a "somewhat more manageable concept of implied prohibition as the test applicable to borderline situations such as personal comfort * * *, going and coming, recreation, acts outside regular duties and other categories in which active performance of work is not involved."

We reject the "reasonableness" test because it is at variance with the purpose of the Workers' Compensation Law—to provide compensation for injuries arising out of and in the course of employment, irrespective of worker fault.

Examining other cases in this area has not been productive. Many courts have ceased to try to articulate a rule for compensability when the worker is

---

[9] 38 Or App at 384, citing *Benafel v. SAIF,* 33 Or App 597, 577 P2d 99 (1978); *Olsen v. SAIF,* 29 Or App 235, 562 P2d 1234, *rev den* 280 Or 1 (1977); *Casper v. SAIF,* 13 Or App 464, 511 P2d 451 (1973); *Jordan v. Western Electric,* 1 Or App 441, 463 P2d 598 (1970).

[10] 1A A. Larson, *supra,* § 21.84, page 5-67.

engaged in an incidental activity as described in category 2, above, saying that "each case must be decided on its own particular facts" or that "argument by analogy is valueless."[11] We reject this approach, as well.

Larson opts for a rule that if the injury occurs in a category of activity other than the performance of the task the worker is employed to perform, the injury is compensable unless (1) the employer would have prohibited the method had the subject been addressed, and (2) the employee either knew or should have known of the implied prohibition.[12]

We question Professor Larson's "implied prohibition" test for these reasons. First, there is too great an element of hindsight involved. After the accident, the employer will certainly say, in many injury cases, "If Clark had asked or had I known, I would have prohibited him from using the press to heat his lunch."

Second, the difficulty of proving an implied state of mind of the worker which is in turn dependent upon the implied state of mind of the employer creates more than a semantic problem.

Benefits are payable for some on-premises injuries during the lunch hour, even though the ingestion of food may be no less valuable if consumed at home, because (1) the injuries normally result from some kind of on-premises hazard, and (2) the employee is within the time and space limits of the employment as set by the employer, i.e., the employer has expressly or impliedly allowed the conduct in question.

We believe that the compensability of on-premises injuries sustained while engaged in activities for the personal comfort of the employee can best be determined by a test which asks: Was the conduct expressly or impliedly allowed by the employer?

[11] *Adams v. Compensation Department,* 249 Or 530, 533, 439 P2d 628 (1968); *Ramseth v. Maycock,* 209 Or 66, 70, 304 P2d 415 (1956); *Munson v. State Ind. Acc. Comm.,* 142 Or 252, 256, 20 P2d 229 (1933).

[12] 1A A. Larson, *supra,* § 21.84, page 5-67.

Clearly, conduct which an employer expressly authorizes and which leads to the injury of an employee should be compensated whether it occurs in a directly related work activity or in conduct incidental to the employment. Similarly, where an employer impliedly allows conduct, compensation should be provided for injuries sustained in that activity. For example, where an employer acquiesces in a course of on-premises conduct, compensation is payable for injuries which might be sustained from that activity. Acquiescence could be shown by showing common practice or custom in the work place.

This test squares with the well established requirement that compensation lies for all activities related to the employment if it carries out the employer's purposes or advances the employer's interests directly or indirectly. *Lamm, supra* at 497-498 and 1A A. Larson, *supra,* § 20. Such a rule is related to the employment environment and the customs and practices of the particular employment and arises from conditions of the employment.

Our statement of the test is in positive terms, rather than in the negative terms of the implied prohibition test suggested by Larson. Although the result in many cases would be the same under either test, we do not intend to necessarily restrict compensability to that which would exist under the implied prohibition test. However, the other prerequisite to recovery must be shown, that is, that the injury arises out of the course of employment.

Neither the Workers' Compensation Board nor the Court of Appeals considered the facts of this case in the light of the rule we have adopted in this opinion. We have previously decided that this court does not review workers' compensation cases de novo. *Sahnow v. Fireman's Fund Ins. Co.,* 260 Or 564, 491 P2d 997 (1971).[13]

---

[13] *See also Hutcheson v. Weyerhaeuser,* 288 Or 51, 602 P2d 268 (1979); *Russell v. SAIF,* 281 Or 353, 359, 574 P2d 653 (1978).

Unless there is no dispute in the evidence, we cannot say, as a matter of law, that the employer expressly or impliedly allowed the conduct which led to Clark's death. The Court of Appeals said in its opinion that the evidence would not permit a finding that the employer's supervisory personnel knew that employees had continued to use the press to heat lunches after the addition of the charger. 38 Or App at 387. Our review of the record convinces us that there was a conflict of evidence on that issue and that there is a question of fact whether the employer impliedly allowed the use of the press by employees for that purpose.

We conclude that we cannot say, as a matter of law, whether the claimant should or should not recover. We therefore remand to the Court of Appeals for further proceedings consistent with this opinion. We leave to the Court of Appeals the decision whether to decide the case or to remand to the Board. *Russell v. SAIF,* 281 Or 353, 574 P2d 653 (1978).

Reversed and remanded to the Court of Appeals.

**HOLMAN, J.,** concurring.

It is my conclusion that the rule of implied authorization set forth in the majority opinion is nothing more than the reverse side of the coin of Professor Larson's rule of implied prohibition and that, in truth, the two rules are the same. I prefer the positive way of stating the rule used in the opinion, rather than Professor Larson's negative way of stating it, but that does not make the rule any different. Indicative of the identity of the rules is that the proof used to prove claimant's case would be identical in each instance. The plaintiff would prove that it was usual for workmen to do as the injured person did at the time of his injury, that the circumstances were such that the

[268]

activity must have been known to management, and that there was no order prohibiting it. The plaintiff could also prove that related or similar activities were engaged in, were probably known to management and were not prohibited. The proof would be the same and would be subjected to the same evaluation regardless of whether the rule is stated in a positive or negative manner.