Argued and submitted December 19, 1980,
reversed and remanded March 30, 1981

In the Matter of the Compensation
of Luther A. Bailey, Claimant.

BAILEY,
*Petitioner,*

*v.*

PETER KIEWIT & SONS,
*Respondent.*

(No. 79-3803, CA 18579)

626 P2d 3

Gregory Parker, Ashland, argued the cause for petitioner. With him on the brief was Cottle, Howser & Cue, Ashland.

Brian C. Pocock, Medford, argued the cause for respondent. With him on the brief was Cowling, Heysell & Pocock, Medford.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

BUTTLER, J.

**BUTTLER, J.**

The only issue in this Workers' Compensation case is whether claimant's injury to his left index finger, sustained while altering employer-furnished work clothes, is compensable. The Workers' Compensation Board (Board) affirmed and adopted the referee's opinion and order denying compensability because claimant's injury did not arise out of and in the course of his employment. ORS 656.005(8)(a). Claimant appeals; we reverse and remand.

In December, 1978, claimant was employed by respondent as a "hydroblaster," a sand-blasting job entailing use of a high pressure water hose. Although not a job requirement, hydroblasters normally wear rain gear, either their own or that furnished by the employer. Many, but not all, of the workers stored their rain gear in the employer's "dry shack," a building equipped with heaters to dry out the rain gear. The foreman assigned areas in the dry shack for the workers to keep their rain gear, but there was no requirement that the gear be stored there rather than taken home. The dry shack also served as a preparation area and meeting place for the workers to use before commencing their work shift. The workers were expected to be ready to start work when the foreman arrived at the dry shack to give them their work assignments.

On the day in question, claimant arrived at the dry shack about 20 minutes before his shift began. He had with him a new set of rain gear which had been issued to him by the foreman the night before. The rain pants were held up by suspenders, and it was a common practice for the workers to alter the suspenders to prevent them from slipping off their shoulders while working. Although the alterations were neither ordered nor prohibited by the employer, the employer was aware of, and acquiesced, in them. Different workers used differing methods of altering the suspenders, but all methods had the same stated purpose. Some tied knots in them and some used string, but the most common method was to slit one of the suspenders and to pass the other suspender through the slit. Claimant was injured when he cut his finger attempting to accomplish the latter method.

Much has been said about how it is determined whether certain activity of an employe arose "out of and in

the course of employment." Little would be gained by reviewing the numerous analyses, particularly in light of *Clark v. U.S. Plywood,* 288 Or 255, 605 P2d 265 (1980), reversing 45 Or App 255, 607 P2d 1215 (1979), and *Rogers v. SAIF,* 289 Or 633, 616 P2d 485 (1980), neither of which had been handed down at the time of the referee's opinion and order, which was adopted and affirmed by the Board.

In *Rogers,* the court reviewed the earlier cases which treated the phrase "* * * arising out of and in the course of employment * * *" as containing two elements, each of which was a distinct test which had to be met for compensability. The court went on to point out that the two-prongs of the test had been, over the years, utilized in such a way that they had become parts of a single test: "is the relationship between the injury and the employment sufficient that the injury should be compensable?" 289 Or at 642. The court concluded that part of its analysis with the statement:

"* * * If the injury has sufficient work relationship, then it arises out of and in the course of employment and the statute is satisfied. Existing law regarding proximity, causation, risk, economic benefit, and all other concepts which are useful in determining work relationship remain applicable. * * *" 289 Or at 643.

In *Clark,* the court said:

"Most claims for on-premises injuries [footnote omitted] fall within one of two general categories:

"Category 1. Injuries sustained while performing one's appointed task;

"Category 2. Injuries sustained while engaged in other incidental activities not directly involved with the performance of the appointed task, such as preparing for work, going to or from the area of work, eating, rest periods, going to the bathroom, or getting fresh air or a drink of water." 288 Or at 260-01.

The court held that a worker, who died on the employer's premises during the lunch hour as a result of attempting to retrieve his lunch from the top of a hot glue press where he put it to keep it warm, was acting in the course of his employment. The court further held that if the employer approved that conduct, it arose out of the employment.

Here, the injury occurred within a reasonable time prior to claimant's shift time while he was on the premises and engaged in preparation for work. Although rain gear was not required, the employer supplied it to claimant. The adjustment of the suspenders was acquiesced in by the employer, presumably because it helped the employes work more efficiently, and perhaps more safely, and was, therefore, a benefit to the employer. The fact that most, if not all, of the employes made some form of adjustment to accomplish the same purpose suggests that the employer contemplated the modification.

We conclude that claimant's activity was sufficiently work-related to make his injury compensable.

Reversed and remanded.