Argued and submitted October 11, 1982, affirmed May 11, 1983

In the Matter of the Compensation of
the Beneficiaries of George Clark, Deceased.

**U. S. PLYWOOD,**
*Petitioner,*
*v.*
**CLARK,**
*Respondent.*

(76-06736; CA A23834)

662 P2d 782

Keith D. Skelton, Portland, argued the cause and filed the brief for petitioner.

Benton Flaxel, North Bend, argued the cause and filed the brief for respondent.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Employer appeals from an order of the Workers' Compensation Board allowing a widow's claim for death benefits. The deceased employe (Clark) was fatally injured when he attempted to retrieve his lunch from the top of a hot glue press where he had placed it for heating earlier in his shift. The sole issue is whether employes' heating their lunches on the press was impliedly allowed by the employer; if it was, then Clark's widow is entitled to death benefits.

This case is before us for the second time. In the initial proceeding, the referee denied compensation; the Board reversed. On appeal, we reversed the Board. *Clark v. U.S. Plywood,* 38 Or App 381, 590 P2d 281 (1979). The Supreme Court granted review to consider the extent to which personal comfort activities of a worker, such as Clark's conduct, are deemed to arise out of and within the course of employment. ORS 656.005(8)(a). It held that the test is whether the conduct is expressly or impliedly allowed by the employer. *Clark v. U.S. Plywood,* 288 Or 255, 266, 605 P2d 265 (1980). The contention here is that the conduct was impliedly allowed, and in that connection the court said:

> "* * * Similarly, where an employer impliedly allows conduct, compensation should be provided for injuries sustained in that activity. For example, where an employer acquiesces in a course of on-premises conduct, compensation is payable for injuries which might be sustained from that activity. Acquiescence could be shown by showing common practice or custom in the work place." 288 Or at 267.

The court remanded the case to us for reconsideration in the light of that test. We remanded to the Board, which remanded to the referee, who held a second hearing. The Board accepted the referee's recommendation that the claim be allowed.

Clark worked in employer's plywood manufacturing plant on the 11 p.m. to 7 a.m. (graveyard) shift. He was allowed a 20-minute meal period. Many employes brought lunches from home, and a substantial number brought meals that required heating. The employer provided a lunchroom, but there were no facilities for heating food. However, the workplace was filled with heat-producing equipment, such as steam pipes, and employes would set their lunches on or beside the equipment for heating a couple of hours before their meal

period. Although there were numerous locations suitable for heating cans of soup, heating pans of food and TV dinners was more of a problem. The most convenient location and, until about one year before Clark's accident, the most popular one for heating such containers was a ledge on top of hot glue press number 1. That practice was well known to employes and supervisors and was not expressly disapproved; the plant superintendent testified that he was aware of the practice.

About one year before Clark's accident, however, a charger was added to the press. In our first opinion, we described the press with charger as follows:

> "The machine consists of two large units, the press and the carriage, each about 20 feet high and 15 feet square. When the units are separated, there is a gap approximately three feet wide between them. Chains on each end of the gap prevent one from entering the gap while the machine is in operation. The chains are connected to a fail-safe device; when either of the chains is unhooked, the machine is inoperable. The press is capable of bonding about 25 sheets of plywood at a time, the sheets lying parallel to the floor. The carriage is mounted on tracks which connect it to the press. The major component of the carriage is the charger. It mechanically feeds the press with the wood to be bonded into sheets and is loaded by the operator and his assistant. It is activated by a switch on the operator's control panel. When activated, the carriage moves along the tracks to the press, closing the gap. The charger nests with the shelves of the press. The wood is pushed from the charger into the press by a device which sweeps from the back of the charger to the end nested with the press. Part of that feeding device is a beam which sweeps across the top of the charger. * * *" 38 Or App at 383 n 1.

The addition of the charger made the press dangerous. From each of the chains that barred entry into the area between the carriage and the press hung a sign warning, "DANGER-Keep out," and operators of the machine were instructed to unhook one of the safety chains (which would disable the machine) before entering the gap between the press and the carriage. Clark was crushed by the beam which swept across the top of the charger after he climbed a maintenance ladder onto the top of the charger to retrieve his lunch without unhooking the chain first. When he placed his lunch on the press, he had unhooked the chain after being instructed to do so by the assistant operator.

Most of the testimony at the second hearing concerned the effect of the addition of the charger on the practice of heating meals on top of the press. All witnesses agreed that the practice dropped off substantially. Supervisors testified that they understood that the practice had stopped completely and that they saw no lunches heated on the press after the charger was added. The plant superintendent testified that he instructed the foremen and the day stock rustler to see that the practice was discontinued. However, he did not follow up to determine whether the practice was, in fact, stopped, and there was uncontradicted testimony by employes on the graveyard shift that they were not informed that they should no longer heat their lunches on the press.

We agree with, and adopt, the Board majority's summary of the evidence:

"The sum of the carrier's evidence is that management in the employer's plant was under directions to inform all employees that use of the hot press for heating lunches was forbidden. Management conveyed the directive to the supervisors of each shift, whose duty it was to inform the employees of each shift. Day and swing shifts received the message. Evidence of a communication of the prohibition to the workers on decedent's shift is lacking. The carrier urges us to make a logical inference: Surely if a directive was clearly communicated to two out of three shifts, there exists a compelling inference that the prohibition was in some manner conveyed to the third.

"In view of the testimony of the witnesses who were employed on the graveyard shift, however, that no such prohibition was, in fact, communicated to their shift to the best of their knowledge, the majority of the Board declines to draw the inference urged by the carrier.

"Although management knew of the express prohibition, the workers on the decedent's shift apparently did not. During decedent's shift, the practice continued with varying frequency. This is plausible because, under the mores of the mill, discipline and supervision are most likely to break down first on graveyard shift. When a lunch was placed on top of the press, it could be seen from the floor merely by looking up. For this reason, one witness believed that the supervisors of graveyard shift were aware of the fact that the workers were continually using the press to heat their lunches."

We add that by all accounts a substantial number of lunches were heated on the press before the charger was added and that management knew it. With the addition of the charger, management considered the practice to be unsafe[1] but did not take adequate steps to insure that all of its employes were instructed to discontinue it. As a result, the practice continued on the graveyard shift. The lunches were visible, and there was no attempt to conceal them. Although supervisors were in the area often, they did not check the ledge for lunches, despite their knowledge of how widespread the practice had been, because they assumed that no one would use it. Because the employer acquiesced in the practice before the charger was added, that acquiescence continued after the addition of the charger in the absence of the employer's communication to the graveyard shift of the new prohibition.

We conclude that the preponderance of the evidence supports the conclusion that no such communication to that shift occurred here; therefore, the employer's acquiescence in the use of the press for heating lunches on the graveyard shift continued. Accordingly, the claim is compensable.

Affirmed.

---

[1] Because unhooking a safety chain renders the machine inoperable and therefore safe for operators to go between the press and the charger to adjust loads, unhooking a chain presumably renders the machine safe for purposes of placing lunches on the ledge. Apparently, and no doubt correctly, the employer considered heating lunches unsafe, because employes who did so were more likely than operators to neglect to unhook the chain.