Argued and submitted September 26, 2007, reversed and remanded
March 12, 2008

In the Matter of the Compensation of
David W. Sisco, Claimant.

David W. SISCO,
*Petitioner,*

*v.*

QUICKER RECOVERY,
*Respondent.*

Workers' Compensation Board
0501516; A132394

180 P3d 46

James W. Moller argued the cause and filed the briefs for petitioner.

Jerald P. Keene argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Claimant seeks review of a Workers' Compensation Board (board) order that determined that his neck injury was not a compensable work-related injury. He argues that the board erred in determining that his injury did not arise in the course and scope of his employment. We review for substantial evidence and errors of law. ORS 656.298(7); ORS 183.482(8); *Proctor v. SAIF*, 123 Or App 326, 328, 860 P2d 828 (1993). For the reasons that follow, we reverse and remand.

We recount the material facts consistently with the board's findings.[1] Claimant worked as a tow truck driver for employer, a towing company located in southeast Portland. Employer had a contract with the Gresham Police Department to tow impounded vehicles, which required that one of the employer's trucks arrive at the impounded vehicle's location within 30 minutes of the tow request. At about 3:00 a.m. on December 15, 2004, claimant was dispatched in response to a call to tow an impounded truck from the parking lot of a Fred Meyer store in Gresham.

As claimant drove east, responding to the call, he exceeded the posted speed limit. Sergeant O'Keefe of the Gresham Police Department saw claimant speeding, turned on his patrol car's overhead flashing lights, and began pursuing claimant. When claimant realized that the police were following him, he flashed his own overhead lights and, according to claimant, he also pointed out the window in the direction of the parking lot where he was headed—just a few blocks away—all, apparently, in an attempt to signal the police that he was responding to a dispatch request. When O'Keefe continued to follow him with lights flashing, claimant pulled over, precisely 30 minutes after employer had received the dispatch request.

Claimant phoned his dispatcher to tell him that he might not make it to the impounded vehicle in time, because

---

[1] Claimant contends that the board's findings were deficient in several respects. We do not address those contentions because they do not affect our ultimate analysis and disposition.

he had been stopped by the police. The dispatcher told claimant to cooperate with the officer, and claimant responded, "I sure will." Claimant understood that employer required him to "comply with police officers when they ask for your identification" and that he could lose his job if he did not so comply.

O'Keefe approached the tow truck and requested claimant's identification. Claimant, however, refused, telling O'Keefe that it was his "sovereign right" to refuse to present his driver's license. O'Keefe explained that claimant was legally obligated to present his driver's license and that he could be arrested for failing to do so. When claimant persisted in his refusal, O'Keefe told claimant that he was under arrest. At that point, claimant locked his door and started to roll up his window.

O'Keefe then ordered claimant to get out of the tow truck. Claimant refused. When backup officers arrived, claimant continued to refuse to leave his truck. The officers then used a stun gun to subdue claimant and forcibly removed him from the truck, against his resistance. Once claimant was out of the truck, the officers put him on the ground, briefly pinning him on his stomach by putting a knee on the back of his neck, and handcuffed him. Claimant was cited for speeding, failure to present a license, failure to yield, and resisting arrest.

Five days later, claimant went to the doctor, complaining of neck pain and recurring spasms in the area, with discomfort radiating down both arms. After an MRI, claimant's doctors diagnosed him with a "disc protrusion on the left at C4-5, in particular, with left C5 nerve root impingement/radiculitis," which they believed was likely caused by the altercation with the officers.

Claimant submitted a claim for the cervical condition. Employer denied that claim, asserting, in part, that the injury had not arisen out of or in the course of claimant's work.[2]

---

[2] Employer contended, alternatively, that, in all events, claimant had a preexisting cervical condition that was the major contributing cause of any injury resulting from the incident. Neither the administrative law judge nor the board reached that alternative contention.

The board, which affirmed the decision of the administrative law judge, determined that, under the "unitary work-connection test," *see, e.g., Krushwitz v. McDonald's Restaurants*, 323 Or 520, 525-26, 919 P2d 465 (1996), the injury was not a compensable work-related injury. The board first determined that, because claimant was injured after violating his employer's directive to comply with police requests for identification, claimant's cervical injury was not incurred "in the course of" his employment. After invoking *Davis v. R & R Truck Brokers*, 112 Or App 485, 829 P2d 732 (1992) (which we address below), the board reasoned:

> "Pursuant to the employer's policy, claimant had 30 minutes to respond to the site to pick up the vehicle. He was traveling between the employer's shop and the recovered stolen vehicle at the time of the incident.
>
> "However, the employer's dispatcher expressly instructed claimant to comply with the directives of the police. Additionally, claimant understood that the company expected him to comply with police officers if asked for his identification. Therefore, consistent with the reasoning expressed in *Davis* * * *, claimant's actions, at the time of the alleged injury, were directly contrary to the expectations and express directive of the employer. Accordingly, consistent with the reasoning expressed in *Davis* * * *, the circumstances of the incident with the police were outside claimant's ultimate job duties as a tow-truck driver and do not meet the 'in the course of' prong of the unitary work-connection test."

(Footnote and internal citations omitted.)

The board further, and alternatively, reasoned that the circumstances here did not satisfy the "arising out of" component of the applicable inquiry, because the injury here arose from a risk "personal" to claimant:

> "[C]laimant's refusal to provide identification to Sgt. O'Keefe, and subsequent failure to comply with the orders of the police officers resulted in an incident which may have caused his injuries. When he was pulled over, claimant was informed by the employer's dispatch to cooperate and comply with the police officer. However, claimant told Sgt. O'Keefe that it was his 'sovereign right' not to comply with

the officer's repeated request for identification. Subsequently, claimant resisted and struggled [against] the officers' attempt to remove him from the tow-truck. Therefore, claimant's risk was based on activities that were not inherent to the job and not while claimant was engaged in his usual employment. Any injury that was sustained occurred as a result of claimant's personal belief that he did not have to comply with the officers' orders. *Thus, claimant's risk of injury from not complying with the orders of the police officers arose from a personal confrontation and therefore represented a 'personal risk.'* "[3]

(Emphasis added.)

On judicial review, claimant contends that his injury was sufficiently related to his work to be compensable under the Workers' Compensation Law. He asserts, particularly, that his injury occurred "in the course of" his employment, as he was responding to a towing request, and that the injury "arose from" a work-related risk, *viz.*, being stopped while speeding to the site of a tow, and not a personal risk. Claimant contends, alternatively, that he was a "traveling employee," and, because he was not on a "distinct departure from his employment activities while on a personal mission," he was within the scope of his employment when he sustained the injury. For the reasons that follow, we agree with claimant's first contention and, hence, do not address the second.

**1-3.** To be compensable under the Workers' Compensation Law, an injury must "aris[e] out of and in the course of employment * * *." ORS 656.005(7)(a). In *Fred Meyer, Inc. v. Hayes*, 325 Or 592, 596-97, 943 P2d 197 (1997), the Supreme Court summarized the controlling inquiry:

"The 'arise out of' prong of the compensability test requires that a causal link exist between the worker's injury and his or her employment. The requirement that the injury occur 'in the course of' the employment concerns the time, place, and circumstances of the injury.

"This court views the two prongs as two parts of a single 'work-connection' inquiry, that is, whether the relationship

---

[3] The board also rejected claimant's alternative argument that his injury was compensable under the "traveling employee" rule.

between the injury and the employment is sufficient that the injury should be compensable. * * * Both prongs of the work-connection test must be satisfied to some degree; neither is dispositive. The work-connection test may be satisfied if the factors supporting one prong of the statutory test are minimal while the factors supporting the other prong are many. Both prongs serve as analytic tools for determining whether, in the light of the policy for which that determination is to be made, the causal connection between the injury and the employment is sufficient to warrant compensation."

(Footnotes and internal citations omitted.)

■  Tracking the board's analysis, we begin with the "in the course of" element. Here, as the board acknowledged with respect to the "time" and "place" facets of that element, claimant was, in fact, responding to a tow call at the time that he was stopped, leading to the interaction that culminated in his injury. Nevertheless, the board concluded that claimant's violation of the employer's directive to cooperate in presenting identification to the police so transgressed the boundaries of claimant's "ultimate job duties" that his subsequent injuries were not incurred "in the course of" his employment. The board erred in so concluding.

*Andrews v. Tektronix, Inc.*, 323 Or 154, 915 P2d 972 (1996), describes the controlling principles. In *Andrews*, the claimant worked for a plumbing company, and his job responsibilities included purchasing and delivering parts and equipment. 323 Or at 157. After the claimant told his supervisor that he had a history of back injuries, the supervisor directed him not to engage in heavy lifting. *Id.* Thereafter, the claimant was sent to deliver some parts to a restaurant, and an employee of a coffee company asked if the claimant would help carry a heavy espresso machine into the restaurant; the claimant agreed, and he injured his back. *Id.* at 157-58. The board determined that the injury was not compensable because it resulted from conduct, *viz.*, heavy lifting, which the employer had directed the claimant not to perform—that is, that the injury-producing activity was outside the " 'boundaries of [the] claimant's ultimate work duties.' " *Id.* at 159 (quoting board's order).

The Supreme Court reversed and remanded for reconsideration. The court began by rejecting the employer's proposition that violation of any work rule necessarily evinced such "a rejection by the claimant of the employer's right of direction and control" as to abrogate "the claimant's status as a [subject] worker." *Id.* at 162. In that regard, the court pointed to case law sustaining the compensability of injuries incurred in the course of on-the-job "horseplay." *Id.* at 163.

The Supreme Court then endorsed the principle that the touchstone of "work-connectedness" is whether the injury-producing activity was within the boundaries of a claimant's "ultimate work." *Id.* at 163-64. In so holding, the court—while disparaging the use of the term "misconduct"—endorsed the following distinction, which it had quoted earlier:

> " 'When misconduct involves a prohibited overstepping of the boundaries defining the *ultimate work* to be done by the claimant, the prohibited act is outside the course of employment. But when misconduct involves a violation of regulations or prohibitions relating to the *method* of accomplishing that ultimate work, the act remains within the course of employment.' "

*Id.* at 159 (quoting Arthur Larson, 1A *Workmen's Compensation Law* § 31.00, 6-10 (1995) (emphases in Larson)).

■ Finally, the court emphasized that, even with respect to employer directives that purport to circumscribe "the boundaries of the claimant's ultimate work, a worker's disobedience is not necessarily determinative." *Id.* at 165. Rather, the court concluded:

> "[T]he facts that an employer has instructed a worker to avoid certain work, and that the worker's injury occurred when he or she disregarded that instruction, are only two of many factors that must be considered in the overall calculation of work-connectedness. Among the additional factors are the degree of connection between what the worker is authorized to do and is forbidden to do, the degree of judgment and latitude normally given the worker, workplace customs and practices, the relative risk to the worker when compared to the benefit to the employer, and the like. Moreover, when a worker's failure to follow a work-defining

instruction *is* taken into consideration, the manner in which the instruction was conveyed, and the worker's consequent perception of the instruction's purpose and scope, also must be considered.

> "To conclude otherwise would be to approve a scheme whereby employers could insulate themselves from workers' compensation liability simply by providing the narrowest possible job descriptions to their employees, and instructing them to avoid *any* work that is not in either scope or manner precisely within the tasks thus assigned."

*Id.* (emphases in original).

*Andrews* is highly instructive here. Most significantly, the Supreme Court in *Andrews* adopted the principle that the violation of an employer rule " 'relating to the *method* of accomplishing [the] ultimate work' " is *not* outside the course of employment. 323 Or at 159 (quoting Larson, 1A *Workmen's Compensation Law* § 31.00 at 6-10) (emphasis in original). Here, claimant's "ultimate work" was responding to tow calls and performing tows. We do not understand employer to dispute that, given the nature of its business, including the "30-minute" response obligation, claimant's work necessarily involved some interaction with law enforcement personnel. *How* claimant interacted with police officers, including with respect to presenting identification upon demand, related to the "*method*" of performing that "ultimate work." Consequently, claimant's violation of employer's directive notwithstanding, his injury was incurred "in the course of" his employment. *Accord Patterson v. SAIF*, 64 Or App 652, 656, 669 P2d 829 (1983) (where the claimant security guard had "the assigned task of removing an unruly patient from the employer's premises" and was injured in releasing the patient after driving him to downtown Portland in violation of the employer's policy against transporting unwanted persons beyond the limits of the employer's property, the claimant's injury was "sufficiently work-related to be compensable" because the employer's rule did not delineate "the boundaries defining his ultimate job responsibilities" but, instead, "govern[ed] the *method* of accomplishing his ultimate work" (emphasis in original)).

*Davis,* which the board invoked, is not to the contrary—and, indeed, corroborates our conclusion. In that case, the claimant was a truck driver for an employer in Turner, Oregon, near Salem. 112 Or App at 487. The employer instructed the claimant, who was in Washington state, to return the truck immediately to Turner. *Id.* Notwithstanding those instructions, the claimant picked up some family members in Turner, without stopping at the employer's yard, and then proceeded south on Interstate 5, having dinner and a drink in Canyonville, and continuing on to just north of Grants Pass, where he was injured in an accident when the truck flipped over. *Id.* at 487-88. The board determined that the claimant's injuries were not compensable because he was no longer in the course of his employment when, contrary to the employer's express directions, he drove to Grants Pass rather than returning the truck to Turner. *Id.* at 490.

We affirmed. After quoting Larson's distinction between employer directives " 'defining the *ultimate work* to be done by the claimant' " and those " 'relating to [the] *method* of accomplishing that ultimate work,' " *id.* at 491 (quoting Larson, 1A *Workmen's Compensation Law* § 31.00 at 6-10) (emphases in original), we concluded:

> "Claimant's misconduct in this case was more than a violation of a regulation or prohibition relating to the method of accomplishing his work. He was specifically told to return the truck and to stop working. Instead, he refused to do either and continued on toward Grants Pass, contrary to his job responsibilities."

*Id.* Thus, in *Davis* (unlike in this case), the employer's directives explicitly defined the temporal and spatial limitations of the claimant's "ultimate work" and claimant's conduct was patently beyond the scope of those boundaries.

Employer remonstrates that claimant's conduct nevertheless exceeded the "ultimate boundaries of his employment" because it "actively contravened the interests and purposes of his economic relationship with the employer" and "ultimately *prevented* completion of the purpose of [the] very trip in which he was engaged." (Emphasis in original.) We disagree. The violation of many, if not most, workplace rules pertaining to the method of performance may subvert a

worker's "economic relationship" with the employer by delaying or impairing the performance of the ultimate work or by increasing the cost of such performance. Consequently, employer's proposed analysis would frequently effectively conflate the distinction between violation of directives "defining the ultimate work" and those "relating to the method of accomplishing that ultimate work," which the Supreme Court confirmed in *Andrews,* and which we applied in *Davis* and *Patterson.* "In the course of" does not bear such gloss.

We thus conclude that claimant's injury did occur "in the course of" his employment. However, as noted, to establish the requisite connection to his employment, claimant must also establish the conjunctive "arising out of" element. *See Fred Meyer, Inc. v. Hayes,* 325 Or at 596 ("Both prongs of the work-connection test must be satisfied to some degree; neither is dispositive."); *see also Redman Industries, Inc. v. Lang,* 326 Or 32, 35, 943 P2d 208 (1997) ("Under [the work-connection] test, both elements must be satisfied to some degree. * * * However, the two elements need not be met to the same degree.").

■   In *Redman Industries, Inc.*, the Supreme Court summarized the substance of the "arising out of" element:

> "[T]he inquiry into whether an injury 'arises out of employment' tests the causal connection between the injury and the employment. A causal connection requires more than a mere showing that the injury occurred at the workplace and during working hours. A causal connection must be linked to a risk connected with the nature of the work or a risk to which the work environment exposed claimant."

326 Or at 35-36 (citations omitted).

■ ■   In assessing whether a "risk" bears the requisite nexus to employment, the Oregon Supreme Court has consistently invoked and applied the following formulation:

> " 'All risks causing injury to a claimant can be brought within three categories: risks distinctly associated with the employment, risks personal to the claimant, and 'neutral' risks—i.e., risks having no particular employment or personal character. Harms from the first are universally compensable. Those from the second are universally noncompensable. It is within the third category that most

controversy in modern compensation law occurs. The view that the injury should be deemed to arise out of employment if the conditions of employment put claimant in a position to be injured by the neutral risk is gaining increased acceptance.'"

*Phil A. Livesley Co. v. Russ*, 296 Or 25, 29-30, 672 P2d 337 (1983) (quoting Arthur Larson, 1 *Workmen's Compensation Law* § 7.00, 3-11 (1978)); *see also Panpat v. Owens-Brockway Glass Container*, 334 Or 342, 349-50, 49 P3d 773 (2002) (applying that formulation); *Redman Industries, Inc.*, 326 Or at 36 (same).

Here, claimant's injury was not the product of a "neutral" risk—that is, a risk without a "particular employment or personal character." *Phil A. Livesley Co.*, 296 Or at 30 (quoting Larson, 1 *Workmen's Compensation Law* § 7.00 at 3-11).[4] Consequently, our disposition turns on whether the operative risk of injury here was "personal to the claimant" or, instead, was "distinctly associated with the employment." *Panpat*, 334 Or at 350; *Redman Industries, Inc.*, 326 Or at 38-40. For the reasons that follow, we determine that claimant's injury resulted from a risk that was sufficiently related to his work to establish the "arising out of" element. Our conclusion in that regard rests largely on our understanding of *Redman Industries, Inc.*, and *Panpat*.

In *Redman Industries, Inc.*, the claimant was assaulted and injured by his coworker, who had become angry after the claimant had called the assailant a series of racially charged names. 326 Or at 34-35. The claimant then filed a workers' compensation claim for the injuries he had sustained. *Id.* His employer denied his claim, arguing that the claimant's injury did not arise out of his employment because the claimant had created the risk himself, by inciting his coworker. The board determined that the claimant's injuries were compensable, but, on judicial review, we disagreed. *See Redman Industries, Inc. v. Lang*, 142 Or App 404, 921 P2d 992 (1996). We determined that the claimant's injuries did not "arise out of" his employment because the assault was

---

[4] Examples of neutral risks include an employee being hit by a stray bullet, struck by lightning, or injured by debris from a distant explosion. *Phil A. Livesley Co.*, 296 Or at 30 n 6.

not precipitated by a "work-related dispute" but, instead, "arose from [the] claimant's use of racially derogatory remarks in an attempt to 'joke' with a coworker." *Id.* at 408-09.

The Supreme Court reversed, concluding that the claimant's injuries did arise from a work-related risk. *Redman Industries, Inc.,* 326 Or at 38-42. The court began by observing that "[t]he normal work environment necessitates that employees work together and exposes them to each other, based solely on their employment status." *Id.* at 38. That proximity, in turn, exposes employees to the risk of assault by coworkers:

> "Just as the workplace exposes an employee to a myriad of risks that inhere in the physical workplace environ-ment—such as machines and office equipment that can malfunction—the workplace also exposes employees to the risk that a coworker may lose control of his or her emotions and assault the employee. Whether the coworker's loss of control is connected to a work-related comment is not dis-positive. That difference does not, *ipso facto,* distinguish those cases that can be deemed to arise out of employment from those that cannot. Employee interactions cannot be so easily isolated and compartmentalized. The most direct cause of an assault by a coworker may be a criticism of another employee's work, lack of hygiene or fashion sense. However, in any such case, the criticism may be but the last of many straws precipitating the assault. Based on the fore-going reasoning, we hold that the risk of an assault by a coworker in the workplace is a risk to which the work envi-ronment exposes an employee."

*Id.* at 40.

That principle, however, is not unqualified. Rather:

> "When the motivation for an assault by a coworker is an event or circumstance pertaining to the assailant and the claimant that originated entirely separate from the work-place, and the only contribution made by the workplace is to provide a venue for the assault, then the rationale does not apply."

*Id.* An example of circumstances falling within that exception would be "where two employees had a romantic relationship outside of work and a workplace assault by one on the other

was based on an event unique to that relationship and was not fueled, in part, by any workplace event." *Id.* at 41.

The Supreme Court then concluded that the claimant's injury "arose out of" his employment because "there is no evidence that [the] claimant and his assailant had any relationship outside of work or that the motivation for the assault was fueled by an occurrence involving them outside of work." *Id.* In that regard, the court emphasized that "[t]he reasonableness or offensiveness of claimant's racially derogatory comments is irrelevant to this inquiry." *Id.* at 41 n 4 (citing *Clark v. U.S. Plywood*, 288 Or 255, 265, 605 P2d 265 (1980) (contention that "compensability is determined by the reasonableness of the worker's conduct has no foundation in the workers' compensation statutes or in Oregon case law")).

*Panpat* turned on the exception, recognized in *Redman Industries, Inc.*, to the general principle of compensability of workplace assault-related injuries. In *Panpat*, the assailant, Blake, and the victim were both employed at the defendant's manufacturing plant and became romantically involved. 334 Or at 345. After the romantic relationship ended, Blake was distraught and disturbed, and, after the victim informed the defendant employer that Blake had called her derogatory names, Blake was placed on medical leave. *Id.* However, while on medical leave, Blake returned to the defendant's plant and shot and killed the victim and then killed himself. *Id.* at 345-46.

The victim's personal representative brought a wrongful death action against the defendant. *Id.* at 346.[5] The defendant moved for summary judgment, contending, in part, that the tort action was barred by the "exclusive remedy" provisions of the Workers' Compensation Law, ORS 656.018(1)(a). *Panpat*, 334 Or at 346. The trial court initially granted the defendant's motion for summary judgment on that ground but then allowed a new trial based on newly discovered evidence. *Id.* at 346-47. We reversed, concluding that the exclusivity provision of the workers' compensation statutes controlled and that the newly discovered evidence was

---

[5] The plaintiff contended, in part, that the defendant had been negligent in failing to provide adequate security and protection, particularly with respect to Blake's entry onto the premises. *Id.*

immaterial to the correct analysis. *Panpat v. Owens-Brockway Glass Container*, 172 Or App 470, 475-80, 21 P3d 97 (2001).

The Supreme Court, in turn, reversed our decision and remanded. The gravamen of the Supreme Court's reasoning was that workers' compensation exclusivity did not apply because the victim's death had not arisen out of her employment. *Panpat*, 334 Or at 349-52. In so holding, the court referred to *Redman Industries, Inc.*'s, example of coworkers engaged in a romantic relationship and then reasoned that the pivotal consideration was "the *motivation* for the assault and whether that motivation 'originated entirely separate from the workplace.'" 334 Or at 351 (quoting *Redman Industries, Inc.*, 326 Or at 40) (emphasis in *Panpat*). The Supreme Court concluded that, because Blake's motivation for killing the victim arose from personal reasons rather than risks "'distinctly associated with the employment,'" 334 Or at 351-52 (quoting *Redman Industries, Inc.*, 326 Or at 37), the victim's death did not "arise out of" her employment.[6]

In sum, both *Redman Industries, Inc.*, and *Panpat* endorse the general principle that, where the nature of the work necessarily exposes the employee to proximate interaction with third persons in the course of performing the work, the risk of injury-producing physical contact with such persons is sufficiently related to employment to satisfy the "arising out of" element. That is, in general, the risk of injury from such interaction "results from the nature of the claimant's work or from the work environment." *Redman Industries, Inc.*, 326 Or at 39.

The sole qualification to that general principle pertains to the *assailant's* motivation: If "the *motivation* for the assault * * * 'originated entirely separate from the workplace,'" then the risk of injury was "personal," not "work-related," and the injury did not "arise out of" the employment. *Panpat*, 334 Or at 351 (quoting *Redman Industries, Inc.*, 326 Or at 40) (emphasis in *Panpat*). The injured claimant's subjective state of mind, including with respect to

---

[6] On remand from the Supreme Court, we rejected other arguments advanced by the defendant and remanded the case to the trial court. *Panpat v. Owens-Brockway Glass Container*, 188 Or App 384, 71 P3d 553 (2003).

engaging in conduct that precipitated the "assault"/injurious conduct is immaterial to the "arising out of" inquiry. *See, e.g., Redman Industries, Inc.,* 326 Or at 41 n 4 (rejecting any consideration of the "reasonableness" of the claimant's use of racially derogatory language as "irrelevant" to the determination of compensability).

■     Consistently with those principles, claimant's injury here was sufficiently "linked to a risk connected with the nature of the work or a risk to which the work environment exposed [the] claimant," *Redman Industries, Inc.,* 326 Or at 36, to satisfy the "arising out of" requirement. Just as the Supreme Court explained in *Redman Industries, Inc.,* that "[t]he normal work environment necessitates that employees work together and exposes them to each other, based solely on their employment status," 326 Or at 38, here, claimant's work environment exposed him to numerous and diverse risks and dynamics associated with driving and involving interactions with third persons, such as other drivers and law enforcement personnel. One obvious example—which we understand that employer here would not dispute—is the risk of a tow truck driver being involved in an accident with another motorist, while speeding in response to a tow call, and then being assaulted by that motorist because of anger and frustration over the accident.

Similarly, the risk of proximate interaction with law enforcement officers after being stopped for speeding, while responding to a tow call, is manifestly a risk related to claimant's employment.[7] Further—albeit (fortunately) only rarely—such interactions can escalate, sometimes resulting in physical injury. In that regard, the assessment of the injury-producing risk here is qualitatively no different than that pertaining to an assault by an angry motorist—or, for that matter, an assault by a coworker. Each is extraordinary—for example, being assaulted by a coworker is hardly the "norm" in most employment environments—but each is "a risk to which the work environment exposed [the] claimant." *Redman Industries, Inc.,* 326 Or at 36.

---

[7] Employer acknowledges that claimant's "speeding [and] his apprehension for such speeding by the police" were "incidental to his assigned duties of driving a tow truck or his method of performing them."

To be sure, claimant's refusal to present his identification and his subsequent refusal to leave his truck precipitated the officers' efforts to forcibly remove him from the truck. Thus, it may well be that, but for claimant's idiosyncratic personal beliefs, he would never have been injured. But the same was true of the claimant in *Redman Industries, Inc.*—and the Supreme Court there explicitly refused to consider the "reasonableness" of the claimant's precipitating conduct. *See Redman Industries, Inc.*, 326 Or at 41 n 4.

Rather, in *Redman Industries, Inc.* (and, of necessity, in *Panpat*), the Supreme Court focused exclusively on the motivation of the third party whose conduct injured the employee. Here, as in *Redman Industries, Inc.*—and unlike in *Panpat*—the motivation for the allegedly injurious conduct did not originate "entirely separate from the workplace, [with] the only contribution made by the workplace [being] to provide a venue" for that conduct. *Redman Industries, Inc.*, 326 Or at 40. Accordingly, claimant's injury did "arise out of" his employment. ORS 656.005(7)(a).

In sum, we conclude that claimant has established to some degree each element of the work-connection test and that, in the circumstances of this case, the combination of those elements demonstrates that "the causal connection between the injury and the employment is sufficient to warrant compensation." *Fred Meyer, Inc.*, 325 Or at 597. Accordingly, we reverse and remand for the board to consider employer's unaddressed alternative arguments.

Reversed and remanded.